# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                    Case No. 14-CR-009

LUCKY L. CHARLESTON,
CLEMMIE L. CARTER, and
SAMUEL H. MCGEE,

        Defendant.

---

## ORDER DENYING MOTIONS TO SUPPRESS

---

On January 22, 2014, a grand jury sitting in Milwaukee returned an indictment charging Lucky Charleston, Clemmie Carter, Samuel McGee and Yolanda Barnes with armed bank robbery in violation of 18 U.S.C. §§ 2113(a) and (d), and brandishing a firearm while committing a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii). In addition, the indictment charged McGee individually with possession of heroin with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and Carter with possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Before the court are motions by Defendants Carter and McGee to suppress all evidence obtained by law enforcement as a result of the December 27, 2013 stop of a motor vehicle which Carter was driving and in which McGee was riding. Carter and McGee, joined by Charleston, also move to suppress all evidence obtained as a result of an initial entry by law enforcement and subsequent search of Room 135 of the Valley Inn motel where the three were staying. Finally, each of these three defendants has moved to suppress all evidence obtained from

the search of the mobile phone seized from his person at the time of his arrest, and all three seek suppression of the evidence obtained from two additional phones recovered from Room 135. For the reasons that follow, all of the motions will be denied.

## I. BACKGROUND

On December 27, 2013, at approximately 8:45 a.m., the BMO Harris Bank in the Village of Black Creek in rural Outagamie County, Wisconsin was robbed by three armed individuals wearing masks and dark clothing. The bank employees described the individuals as younger black males with thin or athletic builds and between five feet, five inches and five feet, eight inches in height. Each was carrying a firearm and at least one had what was described as an assault weapon. They were believed to have been driving a light-colored Chrysler Sebring with damage to the passenger side front bumper. By 9:00 a.m., Outagamie County Sheriff Department (OCSD) investigators had put out an Attempt To Locate (ATL) for the vehicle and individuals involved to nearby law enforcement agencies. The ATL included an alert for "officer safety" because of the presence of firearms.

At 10:45 a.m. Officer Gerard S. Stephanie of the Town of Menasha Police Department (MPD) in adjoining Winnebago County observed a light-colored Chrysler Sebring in the parking lot of the Valley Inn motel located about twenty-five miles south of Black Creek. The vehicle was parked in front of the door to Room 135. Upon closer inspection, Officer Stephanie observed that part of the bumper under the right headlight was missing. (Ex. 1.) He also observed a pair of black gloves on the back seat. Officer Stephanie used his portable radio to contact the Winnebago County dispatcher, who was in contact with the OCSD dispatcher, and obtained more information on the

location of the damage. The description he was given matched the nature and location of the damage he observed on the Sebring.

Officer Stephanie returned to his marked squad car and proceeded to a corner of the parking lot from where he was able to continue observing the Sebring. The Winnebago County dispatcher ran the license number of the Sebring and learned that the vehicle was registered to Dreher Collision, an automobile body shop with which Stephanie was familiar. Officer Stephanie telephoned Dreher Collision on his cell phone and asked about the vehicle. Officer Stephanie was told by a representative of Dreher that the Sebring had been loaned to Lucky Charleston while his car was being repaired. The Dreher representative also stated that Lucky and a friend named Sam McGee had been in to remove something from Lucky's car a day or two earlier. When McGee reached into the truck to retrieve the item, the representative said he saw two handguns in his waistband. The representative described Lucky and Sam as black males. Officer Stephanie later asked Winnebago County dispatch to run a driver's license check on Charleston and learned that his height and build fit the parameters put out by OCSD in the ATL concerning the three robbers.

By that time, MPD Lieutenant Scott Blashka had arrived at the Valley Inn parking lot in an unmarked law enforcement van. OCSD requested that Officer Stephanie take a photo of the damage to the Sebring and send it to them so they could confirm the car matched the description of the get-away vehicle. Officer Stephanie and Lieutenant Blashka were concerned about approaching the car again, however, given the nature of the crime under investigation. Before they decided whether they would be able to do so, four individuals exited Room 135 and entered the Sebring. Two of the individuals that entered the Sebring were African-American males, and the other two were African-American females. The two males appeared to match the general description put out by OCSD of

3

the robbers. They appeared to be between eighteen and twenty-five years old, between five feet, five inches and five feet, eight inches in height. The male driver started the vehicle and began to pull away.

Officer Stephanie and Lieutenant Blashka planned to stop the Sebring when it left the parking lot and got to the roadway. The Sebring did not leave the parking lot, however. Instead, it pulled around to the lobby and the male driver got out to go inside. Officer Stephanie and Lieutenant Blashka activated their emergency lights and pulled up behind the vehicle. The time was now 11:12 a.m. Officer Stephanie exited his squad car and with his gun drawn ordered the driver, who was later identified as Clemmie Carter, to come toward him. When Carter arrived at his location, Officer Stephanie holstered his weapon and told Carter he was investigating a complaint. Stephanie then conducted a pat-down search of Carter for weapons. Officer Stephanie felt a large bulge in Carter's front pocket and asked him what it was. Carter said it was money. Officer Stephanie reached in to make sure there was no knife or other weapon behind it and pulled out a large wad of cash, later determined to amount to $650, in sequential denominations from one dollar bills continuing on to twenties. Officer Stephanie returned the money to Carter's pocket and continued his pat-down. Carter also had two wallets and a cell phone. After he completed the pat-down, Officer Stephanie told Carter he was not under arrest but placed him in the locked backseat of his squad car. As he waited, Carter appeared to be sending text messages on his cell phone.

The remaining occupants of the Sebring were then ordered to exit the vehicle. The two women, later identified as Yolanda Barnes and Stephanie Sharif, were placed in another officer's squad car, and the other male, later identified as Samuel McGee, was handcuffed and placed in Lieutenant Blashka's vehicle. Like Carter, McGee was allowed to retain possession of his cell phone and was observed using it to send text messages after he was removed from the Sebring.

4

While the other occupants were being removed, Officer Stephanie noticed that McGee, who was seated in the back seat, was moving around and looking back at him. After McGee was removed, Officer Stephanie then approached the Sebring with his gun drawn to make sure no one else was inside. After ensuring that no one was in the vehicle, he searched the passenger compartment for weapons. He found no weapons but saw a light-colored piece of clothing that appeared to be of a jersey-like material stuffed into a pocket on the back of the front passenger seat. Stephanie removed the item from the pocket, noted that it looked like a mask, and set it on the back seat.

Officer Stephanie then entered the motel office and was advised that Clemmie Carter and Samuel McGee were the two people registered to Room 135. Stephanie returned to his squad car and asked Carter if he was Lucky Charleston. Carter responded that he was not and identified himself as Clemmie Carter. Other than this question and his earlier inquiry about the bulge in his pocket, Stephanie asked no other questions of Carter. Carter was told at least two times that he was not under arrest, and at some later point, that there was an ongoing investigation of a bank robbery. Stephanie did not feel comfortable asking Carter any investigative questions because he was holding him for another county.

Lieutenant Blashka likewise avoided any questioning of McGee and instead engaged in some small talk. He kept McGee in handcuffs because his van was not equipped with a prisoner transport cage, but he removed them to allow McGee to use the restroom inside the motel lobby. Lieutenant Blashka remained in the lobby while McGee went into the motel restroom unescorted. When asked why he did not ask the suspects any questions, Lieutenant Blashka responded that he did not know enough about the robbery and did not want to taint the investigation. Lieutenant

5

Blashka further explained that it was his understanding that if law enforcement intended to interrogate or ask the suspects questions they had to be under arrest, and he did not think they had enough to arrest them.

At approximately 11:27 a.m., OCSD Sergeant Phillip Christianson arrived at the Valley Inn. Sergeant Christianson had been instructed to proceed to the Valley Motel from the BMO Harris Bank in Black Creek by OCSD Sergeant Corey Besaw, who was leading the investigation, shortly after Besaw received word that MPD had spotted the Sebring. Sergeant Christianson observed the vehicle with the damage that appeared to match the vehicle used by the robbers earlier that day, and the gloves and mask on the back seat. He was also told about the large wad of cash found in Carter's pocket. Sergeant Christianson passed the information on to Sergeant Besaw, who instructed him to detain the suspects.

Shortly thereafter, Sergeant Besaw proceeded to the Valley Inn. While at the bank, Sergeant Besaw had been given the general description of the robbers and the vehicle they were believed to be driving. Sergeant Besaw also viewed a series of photographs taken by the bank's surveillance cameras during the robbery. The photographs depicted the three armed robbers when they were inside the bank, as well as when they were entering and exiting, and the vehicle one of the bank employees thought they were driving. It appeared from one of the surveillance photos that the masks that two of the robbers wore were dark, but the third was light-colored. Sergeant Besaw was also the recipient of the information that Officer Stephanie was passing on from the Valley Inn through the dispatchers for the two law enforcement agencies. It was on the basis of that information that he ordered the suspects detained.

At approximately 12:20 p.m. OCSD Deputy Wall and Sergeants Lee and Tedlie arrived at the Valley Inn motel in marked squads with prisoner transport cages. The OCSD officers took custody of the four individuals and transported them to the Appleton Police Department in Outagamie County for questioning.

In the meantime, Officer Stephanie proceeded to Room 135 with Sergeant Christiansen where he kept watch for the as yet unaccounted for Lucky Charleston. When Sergeant Besaw arrived, they knocked loudly on the door five to six separate times and waited three to four minutes before a person who identified himself as Charleston finally opened it. Officer Stephanie then reached in and pulled Charleston outside of the room. As Sergeant Besaw and another OCSD officer entered the room to see if anyone else was inside, Officer Stephanie told Charleston that he was being detained for an investigation by Outagamie County. When he entered the room, Sergeant Besaw observed piles of dark colored clothing and what appeared to be large bags of clothing in one corner. Sergeant Besaw testified that he kicked the bags to make sure no one was hiding underneath them and saw what appeared to be a magazine for an assault rifle underneath. Upon finding that there was no one else in the room, Sergeant Besaw and the other officer immediately left the room. They later returned with a search warrant and seized items of evidence apparently linking the suspects to the robbery of the BMO Harris Bank in Black Creek.

At the time the OCSD officers took the four occupants of the Sebring into custody, they also seized from them the personal phones they were carrying. In the course of their search of Room 135 at the Valley Inn, OCSD officers also took possession of several additional mobile phones found in the room. On December 30, 2013, OCSD officers sought and obtained search warrants authorizing them to search the internal memory, including video and camera memory storage units

of five separately described phones, in order "to view, copy, print, and otherwise analyze" the "[p]ictorial representations, audio and video recordings, text messages, subscriber information, and personal telephone contacts."

## II. ANALYSIS

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. Const., Amend. IV. The issues raised by the defendants in this case touch upon almost every phrase of that provision. Carter and McGee first argue that MPD Officer Stephanie and Lieutenant Blashka violated their rights under the Fourth Amendment when they seized and continued to hold them without probable cause after they pulled up behind them at the Valley Inn motel lobby, ordered them away from the car they were in and placed them in the back of their respective police vehicles. They also contend that Officer Stephanie violated the Fourth Amendment when he conducted a warrantless search of their car after they had been taken into custody and removed the light-colored mask from the back seat pocket. Charleston argues that Officer Stephanie illegally arrested him when he reached into the motel room where he was staying and pulled him out, and that Sergeant Besaw illegally entered the room without a warrant. All three argue that the OCSD officers illegally arrested them without probable cause and that the evidence illegally obtained by the officers throughout their interaction tainted the search warrant the officers later obtained for the motel room. Finally, the three moving defendants argue that warrants obtained for the various cell phones were

issued without probable cause and a description particularly describing the place to be searched and the things to be seized. Each of their arguments will be addressed in turn.

*A. The Initial Stop and Frisk Was Lawful*

In *Terry v. Ohio*, the Supreme Court recognized the right of law enforcement officers to conduct a brief investigatory stop of a person, even absent probable cause to arrest, when the officer has a reasonable suspicion that such person is involved in criminal conduct. 392 U.S. 1, 22–23 (1968). Additionally, where the officer has reason to believe that the person stopped may be armed, the officer may conduct a pat-down search of his outer clothing for the limited purpose of ensuring that the suspect is not carrying a firearm or other weapon that could endanger the officer or others nearby. *Id.* at 29. The likelihood of criminal activity need not rise to probable cause and falls well short of a preponderance of the evidence standard. *United States v. Amaral-Estrada*, 509 F.3d 820, 827 (7th Cir. 2007). The reasonable suspicion needed to justify the stop and frisk, however, must be based on articulable facts considering the totality of the facts known by the officer at the time. *Terry*, 392 U.S. at 30.

Here, the facts known to Officer Stephanie and Lieutenant Blashka at the time they stopped Carter and McGee at the Valley Inn satisfied this standard. First, Carter and McGee were traveling in a vehicle that matched the model and color of the vehicle the robbers were believed to have used in the robbery that occurred only twenty-five miles away two hours earlier. More importantly, the car had the same kind of damage in the precise location as the robbers' vehicle. Based on the information Officer Stephanie received from Dreher Collision, the car had been loaned to Lucky Charleston, who also fit the general description of the suspects, and only a day or two earlier, Charleston had been seen at Dreher with a friend who had two firearms in his waistband. Finally,

Carter and McGee both fit the general description in terms of height, build, and race of the suspects in the robbery. Based on these facts, the MPD officers were justified in conducting a traffic stop.

The manner in which they conducted the stop was also reasonable. The officers had reason to believe that some or all of the occupants of the Sebring were involved in a bank robbery only a short time earlier that morning. The robbers were armed and at least one was carrying what appeared to be an assault rifle. In light of these facts, the officers were entirely justified in exercising caution during their encounter with the suspects. *See United States v. Hensley*, 469 U.S. 221, 235 (1985) (police officers were "well within the permissible range in the context of suspects who are reported to be armed and dangerous" in approaching, with their guns drawn, a vehicle they had stopped); *see also United States v. Tilmon*, 19 F.3d 1221, (7th Cir. 1994) (holding that investigatory stop of bank robbery suspect's car was not transformed into arrest when car was completely surrounded by police vehicles, police drew their weapons, suspect was ordered to get out of car and to lie prone on ground, and suspect was placed in handcuffs, where perpetrator had threatened to blow up bank with bomb and police officers had been notified by radio dispatch that perpetrator was armed and dangerous); *but see United States v. Howard*, 729 F.3d 655, 661 (7th Cir. 2013) ("Handcuffs in a *Terry* stop and frisk are not and should not be the norm.").

The evidence suggesting that Carter and McGee were involved grew even stronger when in the course of his pat-down search of Carter, Officer Stephanie found a large wad of cash in his pocket. Officer Stephanie testified that he removed the money from Carter's pocket to insure that it was not concealing a weapon. Upon determining that it was not a weapon, Officer Stephanie returned the money to Carter. Officer Stephanie's testimony is credible. Given the amount of money ($650) and the relatively small denominations, the size of the bulge in Carter's pocket must

have been quite large. Under the circumstances, it was reasonable for Officer Stephanie to remove the object and make sure it was not obscuring a weapon. *See United States v. Muhammad*, 604 F.3d 1022, 1026–27 (8th Cir. 2010) (holding that removal from back pocket of hard object that was 4 inches long and 3 inches wide that turned out to be $540 in wallet was within the bounds of *Terry*).

At this point, of course, the reasonable step for Officer Stephanie to take would have been to ask Carter where he got the money and then attempt to verify his explanation. It is just such an inquiry, after all, that *Terry* envisions. 4 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT (hereinafter, LaFave), § 9.2(f) (2012). The central purpose of a *Terry* stop is to conduct a brief investigation to either dispel the suspicions that gave rise to the stop in the first place or develop cause for further investigation and possibly even arrest. Where, as here, there are multiple suspects, it is not uncommon to question them separately to see if there are discrepancies in their stories. *See United States v. Bautista*, 684 F.2d 1286, 1288, 1290–91 (9th Cir. 1982) ("After comparing the inconsistent and contradictory responses, the officers told the defendants they were under arrest. They were taken to police headquarters, searched, and then given *Miranda* warnings. During the search, the police found several of the bait bills taken from the bank. Both defendants subsequently confessed to committing the bank robbery."). But that is not what the officers did here. In fact, Lieutenant Blahska testified that he did not think he could question the suspects unless they were under arrest and he did not think they had enough to arrest them.

## B. The Search for Weapons in the Car Was Lawful

In *Michigan v. Long*, the Supreme Court extended the principles governing a *Terry* frisk for weapons to the passenger compartment of a motor vehicle. 463 U.S. 1032 (1983). *Long* held that upon conducting an investigatory stop of a suspect in a motor vehicle, a law enforcement officer

11

may conduct a search of the passenger compartment, limited to those areas in which a weapon may be placed or hidden, if the officer possesses a reasonable belief that the suspect is dangerous and may gain immediate control of weapons. *Id.* at 1049.

Once all of the occupants of the vehicle had been removed, Officer Stephanie conducted a brief search of the passenger compartment for weapons. In the course of that search, he reached into the seat pocket on the back of the front passenger seat in front of where McGee had been seated and removed what appeared to be a light-colored mask worn by one of the robbers. Given the nature of the offense he was investigating and the movements he had observed McGee making as the other occupants were being removed, Officer Stephanie's suspicion that there might be firearms in the vehicle was reasonable. The removal of the cloth mask to look or feel inside the seat pocket was also reasonable.

The defendants argue that because they had been removed from the vehicle and were in no position to retrieve a weapon, the search of the car was not justified. In *Arizona v. Gant*, the Court held that the right of an officer to search a motor vehicle incident to arrest is limited to situations where "the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." 556 U.S. 332, 351 (2009). In light of *Gant*, it is arguable that Officer Stephanie's search was not justified.

But *Long* did not limit the officer's right to search for weapons to situations where the suspect remains in or near his vehicle, and *Gant* did not overrule *Long*. In fact, the Court suggested in *Long* that the need to search the vehicle for weapons may be greater when the suspect is not under arrest: "[I]f the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." 463 U.S. at 1052. While it may appear that any

12

motive to use a weapon against an officer would be lacking where no arrest is made, that is not necessarily the case. The mere fact that the officer does not have probable cause to arrest at the time of the stop does not mean that the officer's observations will not later prove incriminating. Thus, Justice Scalia noted in *Gant*, "[t]he rule of *Michigan v. Long* is not at issue here." 556 U.S. at 352 (Scalia, J. concurring).

It thus follows that Officer Stephanie's search of the passenger compartment for weapons and removal of the mask from the seat pocket was lawful.

*C. The Arrest of Carter and McGee Was Lawful.*

The fact that law enforcement had reasonable suspicion to lawfully stop Carter and McGee does not mean that they could detain them indefinitely. "Detaining a person for two hours is too long to constitute a *Terry* stop, a type of police detention that is constitutionally permissible without need for probable cause to arrest." *Hamilton v. Village of Oak Lawn*, 735 F.3d 967, 970 (7th Cir. 2013). For the continued detention to remain lawful, the suspicion that led to the stop must at some point have ripened into probable cause. *Id.* Ultimately, however, the reasonableness of the officer's actions remains the touchstone. *Camara v. Municipal Court*, 387 U.S. 523, 539 (1967) ("reasonableness is still the ultimate standard"). "Stops too intrusive to be justified by suspicion under *Terry*, but short of custodial arrest, are reasonable when the degree of suspicion is adequate in light of the degree and duration of restraint." *United States v. Chaidez*, 919 F.2d 1193, 1198 (7th Cir. 1990).

Probable cause to arrest exists when "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an

offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). "[P]robable cause is a standard, not a rule." *Bridewell v. Eberle*, 730 F.3d 672, 675 (7th Cir. 2013). Probable cause, as the name implies, deals "with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175(1949)). "When facts support a 'fair probability' that a suspect has committed a crime, probable cause to arrest exists." *Bridewell*, 730 F.3d at 675 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). In *Gates*, the Court described probable cause as a "commonsense, practical" inquiry into the question whether the circumstances "warrant suspicion" justifying detention. 462 U.S. at 230. It should also be noted that the test for probable cause is an objective one. *Wollin v. Gondert*, 192 F.3d 616, 623 (7th Cir. 1999). Thus, the fact that Lieutenant Blashka did not believe there was probable cause to arrest plays no role in the determination. Moreover, in assessing whether the arresting officers had knowledge of sufficient facts to establish probable cause, the court imparts to those officers all information known by other officers with whom they were in communication. *United States v. Nicksion*, 628 F.3d 368, 376 (7th Cir. 2010) ("Under the 'collective knowledge' doctrine, the officers who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of other officers.").

Applying these principles to the facts of this case, the court concludes that at the time Sergeant Besaw instructed Sergeant Christianson to detain Carter and McGee there was probable cause to arrest them for the robbery of the BMO Harris Bank in Black Creek. As already noted above, they were in a car that matched the description of the car the robbers were believed to have used in the robbery only two hours earlier well within traveling distance of the place robbed, and

they fit the general description of the robbers. The fact that the general color, make and model of the car matched the description of the suspect's car, by itself, was not all that significant. But the fact that it was the same general color, make and model as the robbers' car and had the same kind of damage in the same location was. While not as unique as a complete license plate number, the nature and location of the damage provided the kind of detail that significantly reduced the number of vehicles that would fit the description.

Likewise, the fact that Carter and McGee fell within the same general parameters for age, height and body types as the robbers offered little to distinguish them from the wide field of possible suspects. That they were African-American, however, narrowed it significantly in the area in which the crime occurred and the arrests were made. The most recent census data indicate that the percentage of African-Americans living in Outagamie and Winnebago Counties is 1.1% and 1.9%, respectively. http://quickfacts.census.gov/qfd/states/55/55087.html (last visited March 30, 2014). Of course, a person's race is not an indication or predictor of criminal conduct and, given the history of racism in this country, caution must be exercised to ensure that race is not used as a basis for conducting random stops. But when given as part of the description of one suspected of criminal conduct, it will be more or less important depending on the other details in the description and the make-up of the population in the area in which the crime occurred. *Compare People v. Hopkins*, 235 Ill.2d 453, 922 N.E.2d 1042 (2009) (holding that where armed robbers were described as "two black males in their 20s," grounds to stop one such person in only vehicle seen in area existed where officer "also knew that the population of the neighborhood was predominantly white"), with *United States v. Brown*, 448 F.3d 239 (3d Cir. 2006) (holding that reference to suspects as two "African-American males," even with additional details, not sufficient because "43% of

15

Philadelphia's population is African-American," and that "it was not unusual to see two black males at that location, as there is a predominantly black neighborhood less than two blocks away"); *see generally* David A. Harris, *Using Race or Ethnicity as a Factor in Assessing the Reasonableness of Fourth Amendment Activity: Description, Yes; Prediction, No*, 73 Miss. L.J. 423, 455 (2003).

The fact that law enforcement was aware that Lucky Charleston, a third African-American male fitting the general age, height and build of the robbers, was connected to the same vehicle added to the likelihood that Carter and McGee were involved. The robbers who entered the BMO Harris Bank in Black Creek earlier that morning were described as three black males. The number of individuals involved in a crime can be a factor police use in identifying suspects. *See, e.g., People v. Payton*, 91 Ill. App. 3d 78, 414 N.E.2d 283, 285–86 (1980) ("Given the number of persons, their presence together in a group, their geographical and temporal proximity to the crime, and the fact that one wore a cap and another carried an object, both similar to the items possessed by the robbers, we conclude that Officer Pederson had a basis for making the investigative detention of defendant Payton and the others."). This is why it is not uncommon for those who associate together to commit a crime to "split up" afterwards so as to avoid the likelihood that they will be suspected if seen together.

That McGee had been seen at Dreher Collision with Charleston a couple days earlier with two handguns in his waist band also added to the weight of evidence linking them to the robbery. At least one, and possibly two, of the three robbers shown in the surveillance photos were carrying handguns. (Ex. 5.) But with the liberalization of "conceal and carry" laws, this evidence may offer less significance than it might have in the past. Still, given the nature of the crime and the other evidence, it appreciably increased the likelihood that they were involved.

16

The discovery of a large wad of cash in Carter's pocket, even though no one asked him where he got it, also added to the weight of evidence. Carrying such a large amount of cash in one's pocket is unusual, and given the nature of the crime under investigation, it properly led police to believe they were on the right track. Even at this point, the facts known to the officers created a "fair probability" that Carter and McGee were involved. With the discovery of what appeared to be a light-colored mask in the seat pocket where McGee was seated, however, grounds to arrest clearly existed. When the mask was described to Sergeant Besaw, he concluded it was similar to the one worn by one of the robbers depicted in one of the surveillance photos. Added to the other facts known by Sergeant Besaw at the time, this was sufficient to establish probable cause to arrest. The court therefore concludes that upon discovery of the mask, if not before, probable cause to arrest existed and the continued detention of Carter and McGee was therefore lawful.

*D. The Arrest of Charleston and the Entry to Room 135 Were Lawful.*

Citing *Payton v. New York*, 445 U.S. 573 (1980), Charleston argues that he was illegally arrested in Room 135. *Payton* held that police may not enter a person's home to effect an arrest without a warrant unless they are in hot pursuit of the individual or some other emergency applies. Here, after knocking for three to four minutes, Charleston opened the door and Officer Stephanie immediately grabbed him and pulled him from the room. Charleston contends that Officer Stephanie's reaching into the room in order to take custody of him was an unlawful entry under *Payton*.

As Officer Stephanie placed Charleston in handcuffs, Sergeant Besaw and another OCSD officer entered the room to make sure no one else was inside. Sergeant Besaw testified that while in the room he saw several piles of black clothing. He also saw several bags of clothing in a corner.

17

He kicked the bags to make sure no one was hiding underneath and saw what appeared to be a magazine to an assault rifle. After completing the sweep, Sergeant Besaw and the other officer left and secured the room with the intent to return later with a search warrant. The moving defendants nevertheless argue that Sergeant Besaw's entry and search were also unlawful. They seek suppression of any evidence thereby obtained, as well as any evidence derived from the unlawful arrest and entry.

In *United States v. Santana*, the Court held that police could arrest a person standing in the open doorway of her home without a warrant because the open doorway was a public place. 427 U.S. 38 (1976). Although the Court decided *Payton* several years later, it did not overrule *Santana*, and subsequent cases have made clear that it remains good law. *See United States v. Berkowitz*, 927 F.2d 1376, 1386 (7th Cir. 1991) ("Courts have generally upheld arrests such as that described by Shearer in this case, where the police go to a person's home without a warrant, knock on the door, announce from outside the home the person is under arrest when he opens the door to answer, and the person acquiesces to the arrest."). In *Sparing v. Village of Olympia Fields*, the Court explained how the rule against entering a suspect's home to effect a warrantless arrest operates when the suspect opens the door in response to a knock: "if the police go to an individual's home without a warrant, knock on the door, announce from outside the home that the individual is under arrest when she opens the door to answer, and the individual acquiesces to a slight entry to complete the arrest, the entry is reasonable under the Fourth Amendment and consistent with *Payton*." 266 F.3d 684, 690 (7th Cir. 2001) (citing *Berkowitz*, 927 F.3d at 1387).

Here, Officer Stephanie did not enter Room 135, other than to reach in and take Charleston into custody. At the time, Charleston had just opened the door and was standing in the doorway.

In other words, Charleston was "in a 'public place' for purposes of the Fourth Amendment, since [he] was not in an area where [he] had any expectation of privacy and was not merely visible to the public but was exposed to public view, speech, hearing, and touch as if [he] had been standing completely outside [the room]." *Santana*, 427 U.S. at 38. Charleston did not resist and, in effect, acquiesced in his arrest. Under *Sparing*, Charleston's arrest was therefore lawful. *See also United States v. Whitten*, 706 F.2d 1000, 1015 (9th Cir. 1983) (holding that doorway to hotel room, unlike the interior, is a public place and thus no warrant was required to make the arrest); *People v. Burns*, 200 Colo. 387, 615 P.2d 686 (1980) (holding warrant requirement excused where defendant arrested while standing in the open doorway of his apartment, where he was exposed to public view and where he therefore had no expectation of privacy within the scope of the Fourth Amendment).

The actions of Officer Stephanie were reasonable for other reasons as well. The officers had reason to believe that Charleston was involved in an armed bank robbery earlier that morning. He was likely still in the room, and since the firearms used in the bank robbery were not in the Sebring, they were probably in the room with him. Furthermore, the fact that his friends had not returned to the room would likely give rise to suspicions on his part that they might have been apprehended. Given the fact that Carter and McGee appeared to have been sending text messages on their cell phones shortly after they were detained, this was a strong possibility. The motel was a public place with other guests and members of the public present. These are the kind of exigent circumstances that justify an immediate arrest. *See People v. Smith*, 152 Ill. 2d 229, 604 N.E. 2d 858, 865–66 (1992) (holding that exigent circumstances justified warrantless arrest of murder suspect, even if police crossed threshold of defendant's apartment in order to effectuate arrest, where arrest is for

crime of violence, suspect is reasonably believed to be inside premises and armed, there exists clear showing of probable cause, and police entry, though nonconsensual, is made peaceably).

Finally, it is noteworthy that Charleston was in a motel room, apparently registered to someone else, not his own home. While the Fourth Amendment certainly applies to motel rooms, Payton and its progeny have emphasized the sanctity of the home. *Payton*, 445 U.S. at 589 ("In [no setting] is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home . . . ."); *Berkowitz*, 927 F.3d at 1387 (noting "there is no place where a person's expectation of privacy is greater than in his own home"). An individual's expectation of privacy is far less in a motel room to which housekeeping and management have regular access. The expectation of one who is not even registered is even less. For these reasons, as well, Charleston's arrest was lawful.

The entry by Sergeant Besaw was also lawful. In *Maryland v. Buie*, the Court held that the Fourth Amendment permits a law enforcement officer to conduct a limited protective sweep in conjunction with in-home arrest when the officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors individual posing a danger to those on the arrest scene. 494 U.S. 325, 327 (1990). The Court emphasized that such a protective sweep is not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found and may last no longer than necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises. *Id.* at 335. For a protective sweep to be justified, it is not necessary that the officers have specific knowledge that someone else is present. However, "[t]he sweep must also be justified by more than a 'mere inchoate and unparticularized suspicion or hunch,' regarding the danger." *United States*

*v. Starnes*, 741 F.3d 804, 808 (7th Cir. 2013) (quoting *Buie*, 494 U.S. at 332). The inquiry needed to determine whether a sweep is justified is fact-specific and requires that "the circumstances of the particular encounter be assessed carefully in light of the overarching policy concerns articulated in *Buie* and in its first cousins, *Terry* and *Long*." *United States v. Burrows*, 48 F.3d 1011, 1016 (7th Cir. 1995). "In each instance, the particular configuration of the dwelling and the characteristics of those known to be present and who might be present must be the primary focus of the officers' assessment." *Id.* (footnotes omitted).

Here, the police had probable cause to believe that Charleston was involved in an armed robbery earlier that morning. The guns used in the robbery had not been recovered, and while police knew that three armed males entered the bank, they could not be certain that Carter and McGee were the other two, or that other individuals were not involved. Given the violent nature of the crime, the likelihood that there were guns in the motel room, and with no actual knowledge that they had apprehended all those involved, it was reasonable for the officers to conduct a protective sweep of the room. *See United States v. Tapia*, 610 F.3d 505, 511 (7th Cir. 2010) ("Officers should not be forced to suffer preventable risk of ambush, even where a location is so isolated that the officers could conceivably be protected without entering the area. An 'ambush in a confined setting of unknown configuration is more to be feared than if it were in the open, more familiar surroundings.'") (quoting *United States v. Richards*, 937 F.2d 1287, 1291 (7th Cir.1991)). The significant delay between the time they began knocking and when Charleston finally opened the door would have only increased their suspicion.

As noted above, the search permitted under such circumstances is limited to ensuring that no one else is present. Based on the evidence presented, the court finds that Sergeant Besaw did

not exceed the scope allowed.  Sergeant Besaw testified that he noticed piles of dark clothing and several bags of what appeared to be clothing in a corner of the room.  In his view, the collection of bags was large enough that a person could be hiding under it.  He therefore kicked the pile to make sure there was no one there.  It was at that point that Sergeant Besaw saw what appeared to be the magazine for an assault rifle apparently lying on the floor.  His actions were not improper.

*E.  The Search of the Cell Phones Was at Least in Good Faith*

Lastly, Charleston, Carter and McGee have moved for suppression of any evidence obtained from the cell phones taken from their persons or from Room 135.  They argue that the search warrants obtained by OCSD for the phones are invalid because they were issued without any particularized showing that evidence of criminal activity would be found on them.  In fact, neither the warrants, nor the affidavits submitted in support of their issuance, specify which of the described phones was taken from which person and which were found in Room 135.  The warrant and affidavit simply set forth a physical description of the phone for which authorization to search is sought.  Typical of the descriptions is the following:

> a Kyocera touch screen phone, which is black in color.  The back of the phone consist [sic] of a battery compartment and a small camera and flash on top of the back of the phone.

(ECF No. 30-1, Ex. E and F.)  Two of the warrants include a further detail in the description: one is described as having a "black plastic and rubber OTTER Box case" and the other as having on the front a "square decal with a white square and USA Flag pattern on the outside edge of the square."  (*Id.*, Exs. B. and D.)  Other than these details that distinguish two of the phones, the descriptions include simply the model, color and common features.  The balance of the affidavit submitted in support of each warrant is identical.  The affidavit, signed by Deputy Wall, described the robbery and the detention and arrests of the moving defendants, along with Shariff and Barnes.  It also

22

described the evidence and other property obtained in the search of Room 135, which Carter had admitted he had been renting for the past three months. In addition to "items of evidence from the robbery," including three firearms, two of which were listed as stolen by the Marinette and Menominee police departments, Deputy Wall also described a large amount of what appeared to be stolen property, including personalized jewelry, and new clothing and electronic goods with the merchandise tags still on them, that were found in the room. Only two paragraphs of the affidavit refer to the phones. Those two paragraphs read as follows:

> Your affiant states that Carter, Barnes, Shariff, McGee, and Charleston were each in possession of a cellular phone. Those phones were collected as evidence to the incident in Black Creek at BMO Harris Bank. Multiple other cell phones were located and taken as evidence during the search warrant [sic] on room 135 at the Valley Inn.

> Your affiant is aware that a qualified investigator can examine the contents of a mobile phone, including items thought to be deleted from the operating system memory. Affiant states that information contained within the memory of the above described phones may assist in identifying unidentified co-conspirators, establish a timeline for the offense that would disprove a future claim of alibi, and permit investigators to discover communication between the known and unknown actors that may tend to establish the planning or aftermath of the crimes described above.

(ECF No. 30-1, Ex. F., at 9–10.) Based upon this information, the state court signed the five separate warrants authorizing Deputy Wall to search the described phones for:

> Pictorial representations, audio and video recordings, text messages, subscriber information, and personal telephone contacts; search the internal memory of the phone, video and camera memory storage units to view, copy, print and otherwise analyze the above described items.

(ECF No. 30-1, Ex. A.) The defendants contend that these facts are insufficient to support a finding of probable cause that the phones taken from their persons and from the room in which they were staying contained evidence of a crime.

23

At the outset, it should be noted that the law is not yet clear on whether a warrant is even required to search a cell phone that is seized incident to an arrest. A police officer may perform a warrantless search of an individual incident to a lawful custodial arrest. *See United States v. Robinson*, 414 U.S. 218, 235 (1973) ("It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."). Such a search is justified by "the need to disarm the suspect in order to take him into custody" and "the need to preserve evidence on his person for later use at trial." *Id.* at 234. The scope of the search thus extends to any packages or containers the arrestee may be carrying and from which he might obtain a weapon or evidence. *New York v. Belton*, 453 U.S. 454, 460–61 (1981), now limited by *Gant*, 556 U.S. at 343.

On the basis of these general principles, a number of courts, including the Seventh Circuit, have held that at least a limited search of a cell phone may be performed without a warrant incident to a lawful arrest. *See, e.g., United States v. Flores-Lopez*, 670 F.3d 803, 804 (7th Cir. 2012) (upholding a search of a cell phone incident to an arrest for the limited purpose of obtaining the cell phone number); *United States v. Murphy*, 552 F.3d 405, 411 (4th Cir. 2009) (holding that need for preservation of evidence justified officers' warrantless retrieval of call records and text messages from cell phone seized from suspected narcotics offender incident to arrest); *United States v. Finley*, 477 F.3d 250, 254 (5th Cir. 2007) (upholding retrieval of call records and text messages from the defendant's cell phone incident to his arrest even though police transported the defendant a short distance before conducting this search); *United States v. Fuentes*, 368 Fed. Appx. 95, 98–99 (11th Cir. 2010) (affirming the denial of a motion to suppress evidence discovered on the defendant's cell

24

phone, where probable cause existed for the defendant's arrest, and where the cell phone was "seized in a proper search incident to" this arrest); *Silvan W. v. Briggs*, 309 Fed. Appx. 216, 225 (10th Cir. 2009) (holding that "the permissible scope of a search incident to arrest includes the contents of a cell phone found on the arrestee's person"). These and other cases were recently catalogued by Chief Judge Rosen of the Eastern District of Michigan in a very helpful decision discussing this uncharted area of the law in a case with facts similar to those here. *United States v. Gholston,* Case No. 13-20187, --- F. Supp. 2d ----, 2014 WL 279609 (E.D. Mich. Jan. 27, 2014).

The issue of when and under what circumstances law enforcement officers can search a cell phone is far from clear. As the Seventh Circuit noted in *Flores-Lopez*, "a modern cell phone is a computer." 670 F.3d at 804. The Court further explained:

> Even when used primarily for business it is quite likely to contain, or provide ready access to, a vast body of personal data. The potential invasion of privacy in a search of a cell phone is greater than in a search of a "container" in a conventional sense even when the conventional container is a purse that contains an address book (itself a container) and photos. Judges are becoming aware that a computer (and remember that a modern cell phone is a computer) is not just another purse or address book.

*Id.* at 805. Recently, the Supreme Court granted *certiorari* to review the First Circuit's holding in *United States v. Wurie*, 728 F.3d 1 (1st Cir. 2013), that a warrant is required to search a cell phone obtained in a search incident to arrest. 134 S. Ct. 999 (2014).

Here, of course, the investigating officers obtained search warrants for the cell phones they seized. The moving defendants do not challenge the seizure of their phones but the sufficiency of the warrants that authorized the search of the phones. They contend that the facts set forth in the affidavit are insufficient to support a finding of probable cause.

In determining whether an affidavit establishes probable cause for the issuance of a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 213. The duty of this court, in turn, "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id.* at 238–39. "A court reviewing an initial finding of probable cause to support the search warrant does not decide the question of probable cause de novo but gives great deference to the issuing judge's determination so long as the judge had a substantial basis for the finding." *United States v. Miller*, 673 F.3d 688, 692–93 (7th Cir. 2012) (internal quotations omitted).

The defendants argue that there was no basis upon which a finding of probable cause could be made here because "there is no particularized showing that criminal activity will be found on any phone." Because the affidavits offered in support of each warrant are identical, they contend, it should have been clear that the issuing judge had failed to perform his essential role of ensuring that there was a particularized showing of probable cause. "There is no demonstrated link," the defendants argue, "between the seized cell phones and the criminal activity law enforcement was investigating." (Reply Br. at 6–7, ECF No. 36.)

A search warrant must particularly describe the place to be searched. U.S. Const., Amend. IV. The obvious purpose of this requirement is "to minimize the risk that officers executing search warrants will by mistake search a place other than the place intended by the magistrate." LaFave, § 4.5 (Introduction). The failure to provide a specific description of the place to be searched "renders the warrant a 'general warrant,' which the amendment's plain language clearly forbids."

*United States v. Nafzger*, 965 F.2d 213, 215 (7th Cir. 1992) (quoting *Payton*, 445 U.S. at 584 n.21).

In *Nafzger*, the warrant authorized officers to search anywhere in the Western District of Wisconsin for a particular truck the defendant was believed to have stolen. The truck was to be searched for "certain vehicle identification numbers and parts numbers" located on the vehicle. *Id.* at 214–15. The Court concluded that the warrant was defective, noting that to accept "'the Western District of Wisconsin' as a particular description of the place the truck was to be found we would be giving the government carte blanche to search anywhere in that district that the truck might conceivably be found, condoning the use of the pernicious general warrant, and redacting the particularity requirement from the fourth amendment." *Id.* at 216.

Here, the warrant provided a general description of the cell phones to be searched, but it also noted that the phones were "located at 320 S. Walnut St., City of Appleton, Outagamie County, Wisconsin, occupied by the Outagamie County Department [sic]." (ECF No. 30-1.) In other words, the warrant authorized the search of the phones already in the possession of the Sheriff's Department. Presumably, Deputy Wall did not know the phone numbers or serial numbers for the phones, since that information is not available without accessing the data the phone contains. But he could have stated as to each phone where it was obtained, whether it was taken from the person of one of the defendants or the room in which they were apparently staying. Nevertheless, the fact that the warrant contained not only a physical description but also stated that they were in the possession of the Sheriff's Department was sufficient. "It is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503 (1925); *cf. United States v. Alberts*, 721 F.2d 636 (8th Cir. 1983) (holding warrant authorizing search of garbage bags insufficient where "the

garbage bags were not lawfully in police custody prior to the issuance of the warrant"). Here, there was no danger that the officers would execute the warrants on phones not intended by the magistrate.

The affidavit submitted in support of the application for each warrant likewise failed to specify where each of the individual phones was obtained. A careful reading of the affidavit as a whole, however, convinces the court that the issuing magistrate could reach no other conclusion than that each of the phones described in the warrants was one of the phones taken from the person of one of the five individuals taken into custody or from the room in which they were apparently staying and to which the defendants would have had access. Is this sufficient to establish probable cause for a search of the phones? The defendants argue that it clearly is not. They contend that there must be a particularized showing that evidence of criminal activity will be found on the phones. By "particularized showing," the defendants appear to mean that specific and direct evidence that they used the phones to plan or communicate about the robbery is required. This is far too narrow a definition. The Seventh Circuit has explicitly held that "a finding of probable cause 'does not require direct evidence linking a crime to a particular place.'" *United States v. Prideaux-Wentz*, 543 F.3d 954, 961 (7th Cir. 2008) (quoting *United States v. Watzman*, 486 F.3d 1004, 1008 (7th Cir. 2007)).

In *Gholston*, a defendant charged with armed robbery of a gas station sought to suppress evidence obtained during a search pursuant to a warrant of the contents of a cell phone found in his possession at the time of his arrest. In the application for the warrant, an FBI task force officer detailed the robbery offense on which the defendant and a co-defendant were being held, the facts

that led to the defendant's arrest, and the results of a previous search of the defendant's home. The officer further stated:

> Based upon his training and experience regarding cell phone use in robberies involving multiple participants, that an examination of the data on these devices can reveal evidence of "who possessed or used the device," and that the individuals involved in such "violent robberies often pre-plan the robbery by searching the internet for locations of certain businesses" and by "coordinat[ing] and communicat[ing] via cellular telephone prior to the robbery to arrange meeting times, the availability of firearms and other details related to the robbery."

2014 WL 279609 at *1. The warrant was issued, and upon executing it, law enforcement obtained text messages sent to the co-defendant and accompanying images created on the date of the robbery depicting the defendant in masks that appear to be the same as those worn by the robbers. *Id.* at *2.

Like the defendants in this case, the defendant in *Gholston* argued that the affidavit was insufficient to establish probable cause for the search of the phone. He argued that the affidavit submitted in support of the warrant application was "wholly generic, resting in the officer's training and experience rather than any facts specific to this case." *Id.* at *10. He noted, for example, that the affidavit did not "cite any facts indicating that Defendant or any other individual involved in the robbery actually used a cell phone in connection with this offense." *Id.* at *11. As a result, the defendant argued, the search warrant amounted to no more than a "'general warrant' allowing law enforcement to rummage through the Defendant's personal property to see if any evidence of a crime under investigation could be found." *Id.*

The court in *Gholston* disagreed. The court noted that the officer had stated near the outset of his affidavit that the robbery of the gas station involved "'two participants wearing masks' with one of the participants subsequently identified as Defendant." *Id.* Because the officer had made clear the defendant's joint participation in the robbery with at least one other person, as well as his

training and experience, the court found "no basis to disturb the Magistrate Judge's determination of probable cause to search Defendant's cell phone." *Id.*

Unlike *Gholston*, the affidavit in this case does not offer the training and experience of the officer as support for his opinion that the phones may contain relevant evidence. But this is not fatal. "Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant." *Prideaux-Wentz*, 543 F.3d at 961 (internal quotations omitted); *see also United States v. Biglow*, 562 F.3d 1272, 1280 (10th Cir. 2009) ("Additional evidence connecting a defendant's suspected activity to his residence may also take the form of inferences a magistrate judge reasonably draws from the Government's evidence."). Just as the very nature of a person's home can give rise to a reasonable inference that evidence of criminal activity in which he is involved will be found there, so too the nature of a cell phone can also give rise to an inference that evidence of certain types of crimes will be found in its data banks. It is common knowledge, for example, that cell phones are typically used today to communicate with friends and associates through text messages and emails. Most cell phones are equipped with digital cameras that allow one to quickly take a picture of anyone or anything and send it via text or email to a friend or associate. They are also equipped with search engines, maps and many other functions that are useful for planning and carrying out organized activity. The affidavit submitted by Deputy Wall in support of his application for the warrants provides evidence suggesting that the defendants were joint participants in not only the robbery of the BMO Harris Bank in Black Creek, but other criminal conduct as well. Joint activity requires planning and communication. Given all of the purposes for which cell phones are used, especially to communicate with those with whom one is involved, it was reasonable to believe that the defendants had used their cell phones to

facilitate their crimes and communicate with each other. And because evidence of such use and communication would be stored in the phone data banks, it was also reasonable to believe evidence of their criminal conduct would be found on their cell phones. One need not be a trained police officer to draw such inferences. "[M]agistrate judges may draw their own reasonable conclusions, based on the Government's affidavit and the "practical considerations of everyday life," as to the likelihood that certain evidence will be found at a particular place." *Biglow*, 562 F.3d at 1280; *see also United States v. Gant*, 759 F.2d 484, 488 (5th Cir.1985) (holding that "the nexus between the place to be searched and the evidence sought may be established through normal inferences about the location of evidence."). This is not to say that information contained in the warrant was sufficient to guarantee evidence would be found, but "[t]he Fourth Amendment does not require certainty that a search will uncover the sought-after evidence; a fair probability is enough." *United States v. Aljabari*, 626 F.3d 940, 946 n.1 (7th Cir. 2010).

From the foregoing, it would seem to follow that the issuing judge had a substantial basis for finding probable cause, at least as to the cell phones that were in the possession of moving defendants. The same may not be true for cell phones that were simply found in the room they were renting. A more limited search, at least initially, to determine whether those phones belonged to any of those involved in the criminal activity would have been a more reasonable way of proceeding than seeking a warrant permitting a search of all of the phone's data banks. On the other hand, it is far from clear that the defendants would have standing to challenge phones found in the room in which they were staying that did not belong to them. *See United States v. Stringer*, 739 F.3d 391, 396 (8th Cir. 2014) (holding that defendant lacks standing to challenge search of cell phone belonging to another). In any event, to the extent the defendants have standing to challenge the

search of the separate phones, their motion to suppress will be denied. On this record, the court cannot say that the issuing judge lacked a substantial basis for finding probable cause.

Even if the warrants for the phones were invalid, the officer's good faith reliance upon them would preclude granting the defendants' motions under the circumstances of this case. *See United States v. Leon*, 468 U.S. 897, 920–21 (1984). The exclusionary rule is designed to deter police misconduct. *Id.* at 916. No police misconduct has been shown here. As noted above, the law governing even the need for a warrant to search a cell phone seized incident to an arrest is uncertain. The law simply has not yet caught up with this rapidly changing technology. Deputy Wall clearly acted in good faith in seeking warrants to authorize the search of the phones seized in the course of the investigation. The very fact that he sought warrants is evidence that he was acting in good faith. *Id.* at 920–21. Deputy Wall also had an assistant district attorney review his application before he presented it to the issuing judge. This, too, is evidence of good faith. *See United States v. Merritt*, 361 F.3d 1001, 1012 (7th Cir. 2004) (noting that "where the issue is whether probable cause existed, Agent Vergon's consultation with the AUSA particularly supports the finding that his reliance upon the warrant was objectively reasonable"), *vacated on other grounds*, 543 U.S. 1099 (2005). The suppression of evidence is a drastic remedy that carries heavy costs. *Leon*, 468 U.S. at 907 ("The substantial social costs exacted by the exclusionary rule for the vindication of Fourth Amendment rights have long been a source of concern."). It should not be lightly ordered. Here, there is no evidence of police misconduct that invocation of the exclusionary rule would serve to deter. For this reason as well, the motions to suppress evidence obtained from the phones is denied.

### III.  CONCLUSION

For the reasons set forth above, the defendants' motions to suppress are denied.  The court finds no need to address the Government's alternative independent source and inevitable discovery arguments.

**SO ORDERED** this 1st day of April, 2014.


s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court